*Exhibit A*

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

_____

JEFFREY SNYDER, TERRY SNYDER,
EDWARD BRAZEN, CYNTHIA BRAZEN,
DOMENICO ASSANTE
MASTROGIOVANNI, ANTOINETTE
OLBRANTZ, ANDREA BRESS, DOMENIC
CASIMER GIOVANNI, IDA DEJESUS-
GIOVANNI, VIRGINIA PAVER,

              Plaintiffs,

v.

CITY OF NORTHVILLE, HUNTER
PASTEUR NORTHVILLE LLC, and TOLL
NORTHEAST V CORP.,

              Defendants.

Case No. 24-_____-CE

Hon. _____

---

VARNUM LLP
Kyle P. Konwinski (P76257)
Christopher J. Biggs (P86704)
*Attorneys for Plaintiffs*
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
kpkonwinski@varnumlaw.com
cjbiggs@varnumlaw.com

---

*There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the Complaint.*

## **VERIFIED COMPLAINT**

NOW COME Plaintiffs, by and through their counsel, VARNUM LLP, and hereby state

for their Complaint, and Verified Complaint of Jeffrey Snyder, against Defendants City of

Northville, Hunter Pasteur Northville, LLC, and Toll Northeast V Corporation ("Toll Brothers")

as follows:

24-010254-CE FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   7/17/2024 10:32 AM   Twyona Adams

## INTRODUCTION

1.       Defendants' callous demolition and construction of a large, contaminated property surrounded by neighborhoods is causing irreparable harm to the neighbors, including Plaintiffs'. Defendants' violations of the law have already caused a catastrophic oil spill in the Rouge River and is causing harmful dust to enter onto Plaintiffs' properties.  Defendants' construction should be halted until the safety of the nearby residents and environment can be secured.

2.       Defendants are redeveloping a former horse-racing track in the City of Northville (referred to as the "Downs Development").  The 48-acre site is located a few blocks from the City's downtown and is surrounded by neighborhoods, which is where Plaintiffs live.  Due in part to its age, the site contains many toxic substances, including asbestos, per- and polyfluoroalkyl substances ("PFAS"), polychlorinated biphenyls ("PCBs"), mold, lead, mercury, zinc, and other hazardous substances with the potential to impact the health and wellbeing of nearby neighborhoods.  Defendants' activities (or, in the case of Defendant City of Northville, its failure to implement law) are causing substances from the site to enter onto Plaintiffs' properties and into the environment.

3.       Not only does an enormous amount of earthwork need to be done for the development, but structures, including the horse-racing track stadium, are being demolished.  All the structures with the exception of the enormous stadium (the "Clubhouse") have been demolished, but the Clubhouse demolition dwarfs the demolition that has occurred to date and is only partially complete.  In other words, the Downs Development is a massive project with severe consequences if not done with the care and caution as required by the law, especially considering the most difficult and unsafe demolition is still ongoing.

4.      Despite the stakes, Defendants are putting profits over safety.   Defendant Developers want to finish the development as fast as possible to generate a profit, but Defendants have violated the law in doing so.   Defendant City of Northville, for its part, has abdicated its lawful responsibilities so that its representatives can tout development progress and increase the tax base.

5.      Defendants' motives have led to horrible consequences. On June 21, 2024, Defendants' demolition caused a motor oil and kerosene spill into the Rouge River, which undoubtedly should have been prevented.   The barrels of oil and kerosene were in plain sight inside a building.   Yet, Defendants bulldozed the building, rupturing the drums and releasing dozens of gallons of oil into the environment and Rouge River.   To make it worse, had Defendants adequately protected the storm drains during construction like they were supposed to, the spill may have been minimized or prevented.

6.      Just as alarming, over the last sixteen weeks since demolition approximately started, contaminated dust has continually drifted from the demolition site onto the surrounding neighbors' properties, including Plaintiffs'.   The dust is palpable outside and even infiltrates indoors.   Dust is visible even when surfaces are cleaned daily.   The dust is so bad that numerous Plaintiffs have had breathing issues.   Sneezing, coughing bouts, and sore throats ensue.   Plaintiffs are fearful for the health consequences of breathing in the dust from a contaminated site.   The dust is significantly interfering with the use and enjoyment of Plaintiffs' properties.

7.      Defendants' construction activities should be temporarily halted to ensure no further irreparable harm to the nearby neighbors or the environment.   Construction should not be allowed to continue until safety of nearby residents and the environment is secured, namely by ensuring that Defendants comply with the law and that Defendant City of Northville fulfills its

3

duties imposed by the law.   Plaintiffs must also be compensated for the impact to their properties.

## JURISDICTION AND VENUE

8.      Plaintiffs Jeffrey and Terry Snyder lives at 508 Gardner Street, City of Northville, Michigan, 48167.

9.      The Snyder family lives in the Beal Town Neighborhood, which is immediately adjacent to the east of the Downs Development.

10.      Plaintiffs Domenic Casimer Giovanni, Ida de Jesus-Giovanni, and Domenico Assante MastroGiovanni live at 443 River Street, City of Northville, Michigan, 48167.

11.      The Giovanni family lives in the Beal Town Neighborhood, which is immediately adjacent to the east of the Downs Development.

12.      Plaintiff Virginia Paver lives at 461 River Street, City of Northville, Michigan, 48167.

13.      Ms. Paver lives in the Beal Town Neighborhood, which is immediately adjacent to the east of the Downs Development.

14.      Plaintiffs Edward and Cynthia Brazen live at 370 Fairbrook Street, City of Northville, Michigan, 48167.

15.      The Brazen family lives in the Fairbrook-Wings Neighborhood which is immediately adjacent to the west of the Downs Development.

16.      Plaintiff Andrea Bress lives at 455 River Street, City of Northville, Michigan, 48167.

17.      Ms. Bress lives in the Beal Town Neighborhood, which is immediately adjacent to the east of the Downs Development.

4

18.     Plaintiff Antoinette Olbrantz lives at 335 River Street, City of Northville, Michigan, 48167.

19.     Ms. Olbrantz lives in the Beal Town Neighborhood, which is immediately adjacent to the east of the Downs Development.

20.     Defendant Hunter Pasteur Northville, LLC is a Michigan limited liability company with its principal office located at 32300 Northwestern Highway, Suite 230, Farmington Hills, Michigan 48332.

21.     Defendant City of Northville (the "City") is a Michigan municipal corporation with its principal offices located at 215 West Main Street, Northville, Michigan 48167.

22.     Toll Northeast V Corporation is a Delaware corporation ("Toll Brothers"), with offices located at 1140 Virginia Drive, Fort Washington, Pennsylvania 19034.

23.     Jurisdiction of the claims for mandamus and declaratory and injunctive relief is appropriate in this Court pursuant to Mich. Const. 1963, art. VI 13; MCL 600.601, 600.605 600.6419(6), and MCR 2.605.

24.     Venue is proper in this Court.

## GENERAL ALLEGATIONS

**Northville Downs**

25.     In 1944, Northville Downs opened as the first nighttime harness racing track in Michigan.

26.     Northville Downs was also the first location in Michigan to allow parimutuel, or pool betting, gambling.

27.     Northville Downs stayed in continuous operation from approximately 1944 to 2024.

28.     As casinos opened in Detroit and on tribal reservations, and with the rise of online gambling, horse racing underwent a steady decline in Michigan—in 2018, Northville Downs was the final racetrack remaining.

29.     On February 3, 2024, Northville Downs hosted its final race.

30.     The Rouge River flows through downtown Northville.   The section that goes through town is known as the "Walled Lake Branch" of the Middle Rouge River.

31.     Several decades ago, Northville Downs covered the Middle Rouge River in a massive culvert.  The culvert was covered with contaminated dirt and then over 1,100 feet of the river was paved over to create more space on the property.

32.     In 2018, developer Hunter Pasteur Homes secured a property interest in the bulk of the property at Northville Downs to build luxury residential and retail units.



*An aerial view of Northville Downs in February 2024, prior to closing. The Clubhouse is located along the edge of the track. The Beal Town Neighborhood is visible in the upper righthand corner. The Rouge River is also visible in the background. Source: Detroit Free Press.*



*A satellite view of the 48-acre Northville Downs property. The Beal Town Neighborhood (blue) is depicted across the street to the right of The Downs (yellow); Fairbrook-Wings Neighborhood (red) is to the west. Plaintiffs' homes are denoted via numbered markers. Source: Google Earth.*

## The Downs Development

33. The Downs Development is a Planned Unit Development (PUD) undertaken in partnership with and pursuant to the approval of the City of Northville (the "Downs PUD").

34. Developers Hunter Pasteur and Toll Brothers ("Developers") own the property on which the Downs Development is located.

35. The Developers intend to transform the site of Northville Downs track into luxury housing and retail space in the heart of Northville.



**Conceptual Landscape Master Plan**

THE DOWNS › CITY OF NORTHVILLE, MI › AUGUST 16, 2022    1

*Site plan of The Downs development, adjacent to the Beal Town Neighborhood and downtown Northville.*

36.     The Downs will offer approximately 470 residential units, including apartments, condos, and townhomes, as well as retail space and an estimated 16 acres of public parks and greenspace.

37.     At conclusion of the development, the City is going to own a portion of the site containing a riverwalk along the Rouge River.

38.     To develop Northville Downs into The Downs PUD, numerous buildings have already been demolished and the Developers must finish demolishing the Clubhouse, as well as excavate multiple feet of soil in some portions of the site.  The contaminated dirt covering the Rouge River must be excavated and the River will become exposed.

8

39.     For years, citizens, including Plaintiffs, expressed concerns to the City about proper management of demolishing the site.   Their worries were continually ignored or downplayed at local City Council and Planning Commission meetings.

40.     At the outset, the City increased the PUD approval process, pushing through phases of the PUD before concerned residents had adequate time to review the materials.

41.     Residents, including Plaintiff Jeff Snyder, informed the City Council at its September 18, 2023 meeting that 48 hours was not long enough to review the Planned Development Agreement (the "Agreement").   But even in that short window, Plaintiffs and other residents were able to identify several components of earlier plans and conditions to the PUD that were absent from the Planned Development Agreement.

42.     Residents at the September 18, 2023 City Council meeting voiced concerns "about how fast everything is moving" and the "short sightedness in the possible effects of the development process."   Residents were worried that City Council did not have enough time to review the Agreement.

43.     At the November 21, 2023 Planning Commission meeting, Plaintiff Jeff Snyder requested that screens be installed along the eastern edge of the Site to protect the Beal Town neighborhood.   No such screens were erected.

44.     At a public community meeting on March 26, 2024, City Manager George Lahanas promised the installation of an air control monitoring system, as well as real-time reports, to ensure nearby neighborhoods are free from unwanted airborne pollutants.   To date, none have been installed in the neighborhoods and real-time reports are not provided.

45.     Had it not been for the City Manager's promise, Plaintiffs would have installed their own air monitoring systems, but chose to rely on the promises made by the City instead, believing the City to be acting in good faith.

46.     Defendants entered a "Commitment to Dedicated Oversight" at the Downs site, but it was not provided to local residents for the first twelve weeks of demolition activities.

47.     Additionally, for the first twelve weeks of demolition activities, the City failed to require the building official to inspect the site with regularity.  The City's failure meant that many of Developers' frequent violations of local requirements, including start times, failure to mitigate excessive dust or employ water cannons, and continuance of work despite noncompliance, were never addressed or enforced by the City.

48.     The City failed to require Developers to secure demolition permits.

49.     The City allowed work to commence without the Developers providing a performance bond, which violated Section 34-119 of the City Code and placed the City in financial and legal risk.

50.     The City committed to providing full financial transparency regarding the taxpayer's burden for the development relative to realized grant monies.   However, the information provided by the City does not specify what grant money has been realized and thus disguises the true balance taxpayers must shoulder.

**Defendants' Demolition Activities Begin Impacting Local Residents and Neighborhoods**

51.     Demolition activities began at the site in early March 2024.

52.     The Clubhouse at the Downs site dates to the opening of the Northville Downs track in 1944.  Other buildings slated for demolition at the site are expected to be of a similar age.

53.     Construction of old buildings has a higher risk to contain toxic and hazardous chemicals that can easily be released during poorly executed demolition, including (but not limited to): asbestos, PFAS, PCBs, mold, pressure treated lumber particles, fine and coarse-grained particulate matter (PM), lead, mercury, and other heavy metals.

54.     In addition, large swaths of the site contain topsoil that exceeds EGLE's criteria threshold levels for zinc.

55.     Demolition activities at the site has generated severe quantities of fugitive dust, creating clouds that billow into the air and spread outward from the site, including onto Plaintiffs' property.

56.     Fugitive dust is also known as particulate matter.  It can be coarse-grained (having a diameter of 10 microns or less, called PM10) or fine-grained (having a diameter of 2.5 microns or less).

57.     According to the U.S. Environmental Protection Agency ("EPA"), fugitive dust can have significant impacts on human health by traveling into and damaging the lungs. Compounding the problem is the ability for toxic and carcinogenic chemicals to attach to fugitive dust particles and enter the bloodstream via the lungs.

58.     Fugitive dust emissions have been linked to asthma, emphysema, chronic bronchitis, chronic obstructive pulmonary disease, and heart disease.

59.     As demolition has progressed, copious amounts of both fine-grained and coarse dust have become airborne with disturbing frequency, drifting far off the site, including on Plaintiffs' properties.

60.     Plaintiffs have increased coughing and sneezing fits, as well as sore throats. These problems can occur even within their own homes.

61.     Ms. Olbrantz had a hard time breathing since the dust started spreading.  She was out of town when the demolition started in earnest; upon returning home, she "immediately" had trouble breathing.

62.     Mrs. DeJesus-Giovanni, for example, has noticed changes to her daily life, particularly with respect to health concerns.  She has experienced respiratory distress, with increased coughing and discomfort.  She has been forced to restrict the time her family and pets spend outdoors to minimize their exposure to dust and the potential health risks associated with it.

63.     The dust problems are an "absolute nightmare" for Mr. Giovanni and he is gravely concerned for his and his family's future health.  He has faced breathing problems for 14 weeks as demolition commenced.

64.     Wind gusts have reached over 35 miles per hour this summer, causing substantial amounts of dust to accumulate on the exteriors of homes, including Plaintiffs'.

65.     The dust has even infiltrated homes, coating floors and surfaces, despite concerted efforts to keep doors and windows closed.  Ms. Olbrantz had to cover her windows with plastic in an unsuccessful attempt to prevent the dust from infiltrating.

66.     Mr. Giovanni put a screen over his garage door so he could have the garage door open while still being protected.  However, the dust penetrated the screen designed for the very purpose of preventing dust, covering the entire garage and damaging the classic Jaguar car within the garage.

67.     Plaintiffs are concerned about the impact of the dust on their pets as well.  The Giovanni family can no longer put their cat outside due to the cat's suffering from the dust plumes.

68.    Plaintiffs now fear developing health problems from breathing in the dust.



*An image of work occurring at the Demolition Site on June 5, 2024, showing the severe, opaque haze caused by Defendants' fugitive dust emissions.*



*An image of a car coated in dust, parked near the Demolition Site on June 5, 2024.*

**The City and The Developers Refuse to Take Action**

69.     Proper mitigation of the dust is required by law.

70.     Despite the persistent efforts of local Northville citizens over the last sixteen weeks to address these problems, neither the City nor the Developers have taken steps to reach any kind of workable solution.

71.     The dust mitigation strategy the Developers are employing during construction hours (which last from 7:00 AM to 6:00 PM, Monday-Friday) is inadequate.  The Developers typically operate one single water truck to spray dust during the day, but its limited efficacy is compromised even further by constant breakdowns and unacceptably long refill periods.

72.     No dust control or mitigation operates outside of construction hours.  Each night and weekend, the dust spreads.

73.     A single water truck cannot handle the demand generated by a 48-acre site with at times up to 10 active construction zones, acres of disturbed earth, and multiple uncovered dirt mounds.  Although another truck has appeared onsite sporadically, its operator fails to engage its water sprayer effectively by not aiming properly and taking frequent breaks to scroll a cellphone while supposedly on duty.

74.     Furthermore, the water cannons on the trucks lack any water monitoring measures.  The City connected the water cannon hoses to public fire hydrants, allowing the Developers unmetered use of hundreds of thousands of gallons of water during peak usage hours.  Without metering, there is no way the City can charge back those costs to the Developers.  This contravenes the City's explicit restricted water usage policies and passes inflated, peak water prices to taxpayers.

75. Due to the City's failure to require a dust mitigation system and the Developers failure to implement one, the surrounding neighbors like Plaintiffs are forced to call the engineering consultant on the project to ask for any kind of assistance, which is limited to forcing the sprayers to arrive on scene and actually do their job. However, the engineering consultant does not have the authority to shut the site down if Developers are violating an ordinance or law.

76. The City has allowed significant amounts of fugitive dust from the Developers to accumulate on private property in adjacent neighborhoods.

77. Site security fencing was installed, but it does not protect streets and residents of adjacent neighborhoods from the dust, as dust has continued to drift onto their properties and cause respiratory issues.

78. The City has failed to enforce requirements for contractor trucks to use a wheel wash station before exiting the site, in violation of Sections 34-123 and 34-126 of the City Code. This has allowed the trucks to spread contaminated soil around the City to be washed into the storm sewer system, despite months of complaints by residents.

79. Finally, the City's most egregious lack of oversight came to a flashpoint earlier in June when required sedimentation controls were not in place when they were needed. The City failed to require proper stormwater sediment protection such as placing and maintaining straining fabric over sewer entrances, in violation of Developers' NPDES permit, SESC permit, and Section 34-118 of the City Code.

**The Oil Spill**

80. On June 21, 2024, the Developers began demolishing an outbuilding located directly across the street from the Beal Town Neighborhood. The Developers failed to remove

several oil drums and a tote containing motor oil and kerosene before they began demolishing the building.

81.     The Developers realized their mistake after oil began seeping out from the rubble and sheeting across the ground.  The Developers' efforts to erect a berm to contain the oil failed, and the oil flowed into two sewers that lacked sedimentation controls, discharging the oil directly into the Rouge River.



*Oil on the surface of the Rouge River following Defendants' spill. Source: Fox 2 Detroit.*



*Oil spill containment measures on the Rouge River in Northville. Source: Fox 2 Detroit.*

82.     Significant remedial activities by the Department of Public Works were required to scrub the storm drains to remove remaining oil residue.

83.     There is a lack of stormwater sewer entrance controls in the neighborhoods surrounding the Site as well.  A lack of protective fabric or other controls meant that mud from demolition activities entered the sewers, causing odorous backups throughout Beal Town and other neighborhoods.  The Department of Public Works needed to clean out these sewers as well.

84.     The totality of these issues—numerous instances of poor or no execution of health and safety regulations by developers coupled by a total lack of oversight from the City—leaves nearby residents at a severe risk as demolition and construction continues.

85.     Because another mistake by the Developers could mean the introduction of further hazardous or toxic substances into the environment or onto to Plaintiffs' properties, the Developers' development activities should be paused until adequate controls are in place.

**COUNT I: PRIVATE NUISANCE (As to the Developer Defendants)**

86.     Plaintiffs reallege and incorporate by reference the preceding and subsequent allegations.

17

87.     Plaintiffs' use and enjoyment of Plaintiffs' land is interfered with substantially and unreasonably through Defendants' actions.

88.     Plaintiffs have property rights in their homes and surrounding land located in the neighborhoods surrounding the site.

89.     Defendants' demolition and construction activities creates airborne dust which spreads to the surrounding neighborhoods, depositing and accumulating on Plaintiffs' private property.

90.     The accumulation of dust on Plaintiffs' exterior and interior surfaces of their homes, plus on their lawns and elsewhere on their curtilage, unreasonably and substantially interferes with the use and enjoyment of their property.

91.     The dust from demolition of the Clubhouse and other structures at the Site could contain various hazardous and toxic substances, including asbestos, PFAS, PCBs, lead, mercury, mold, zinc, and others.

92.     Defendants' actions are the legal cause of the dust on Plaintiffs' properties.  Such consequences are a foreseeable result of demolition activities occurring across the street from Plaintiffs' neighborhoods and is even more foreseeable given the near lack of dust abatement measures undertaken by Defendants.

93.     Such action is intentional, as the Defendants consciously acted to carry out their goal of excavating the soil and demolishing the buildings that have and will continue to create the dust plumes impacting Plaintiffs' properties.

94.     Such action is unreasonable because Defendants could take further steps to mitigate the intensity of the dust as well as the hazardous and toxic substances within the dust, but choose not to do so.

95.     The dust on Plaintiffs' properties is unreasonable because Defendants are violating several laws, as discussed further below, by allowing the dust to enter onto Plaintiffs' properties.

96.     Defendants are acting negligently by allowing dust to enter onto Plaintiffs' properties.

97.     Defendants' actions of demolishing property and structures with hazardous substances constitutes ultrahazardous conduct.

98.     For the reasons set forth below, Defendants' actions—in causing dust on Plaintiff's property and releasing other contaminants into the environment—are proscribed by law.

99.     For example, Michigan Administrative Code, Rule 336.1901 ("Rule 901") provides that, notwithstanding the provisions of any other rule, a person shall not cause or permit the emission of an air contaminant or water vapor in quantities that cause, alone or in reaction with other air contaminants, either of the following: (a) injurious effects to human health or safety, animal life, plant life of significant economic value, or property; or (b) unreasonable interference with the comfortable enjoyment of life and property.

100.    Part 55 of NREPA defines "air contaminant" to mean a dust, fume, gas, mist, odor, smoke, vapor, or any combination thereof." MCL 324.5501(a).

101.    Defendants' fugitive dust plume emissions are an air contaminant in violation of Rule 901.

102.    Defendants' fugitive dust plume emissions are negligent under the law.

103.    Defendant's fugitive dust plume emissions are an invasion that, if not intentional, were unintentional but actionable as negligent.

104.    Defendants' nuisance substantially interferes with Plaintiffs' use and enjoyment of their properties, including, but not limited to, by preventing their normal use of their properties (such as normal indoor and outdoor activities), by causing mental annoyance, a fear of future health injuries by breathing in the dust, coughing, sneezing, and sore throats, and by diminishing their properties' values.

105.    Therefore, Defendant's creation of dust plumes that deposit on and unreasonably impact the use and enjoyment of Plaintiffs' properties is as a private nuisance under the law.

## COUNT II: PUBLIC NUISANCE (INCLUDING NUSIANCE PER SE) (All Defendants)

106.    Plaintiffs reallege and incorporate by reference the preceding and subsequent allegations.

107.    Defendants' conduct constitutes an unreasonable interference with a common right enjoyed by the general public.

108.    Plaintiffs seek solely injunctive relief against the City of Northville as it pertains to the public nuisance.

109.    Plaintiffs are situated different than the citizenry at large because Plaintiffs are impacted by Defendants' construction activities due to Plaintiffs' proximity to the site; the dust does not impact citizens who do not live close to the site.  Similarly, the portions of the Rouge River impacted by Defendants' oil spill are in close proximity to Plaintiffs' properties.

110.    Part 31 of NREPA, MCL 324.3109(1), provides that: "A person shall not directly or indirectly discharge into the waters of the state a substance that is or may become injurious to any of the following:  (a) to the public health, safety, or welfare; (b) to domestic, commercial, industrial, agricultural, recreational, or other uses that are being made or may be made of such

waters; (c) to the value or utility of riparian lands; (d) to livestock, wild animals, birds, fish, aquatic life, or plants or to their growth or propagation; and (e) to the value of fish and game."

111.    A violation of MCL 324.3109(1) is "prima facie evidence of the existence of a public nuisance." MCL 324.3109(6).

112.    Article III, Section 34-81 of the City of Northville Code of Ordinances defines a "public nuisance" as " whatever annoys, injures or endangers the safety, health, comfort or repose of the public; interferes with or destroys or renders dangerous any street or highway; allows accumulation of junk or obnoxious matters on private property; or in any way renders the public insecure in life or property. Public nuisances shall include, but not be limited to, whatever is forbidden by any provisions of this article and the common and statute law of this state."

113.    Section 33.02 of the City of Northville Zoning Ordinance states: "Any building or structure which is erected, altered or converted, or any use of premises or land which is begun or changed subsequent to the time of passage of this Ordinance and in violation of any of the provisions thereof is hereby declared to be a public nuisance per se, and may be abated by order of any court of competent jurisdiction."

114.    Section 20.08.1 of the Northville Zoning Ordinance empowers the Planning Commission to place "reasonable conditions" upon the approval of a PUD.

115.    Section 20.08.4 of the Northville Zoning Ordinance states that a violation of an approved condition to a PUD is a violation of the Zoning Ordinance.

116.    The Planned Development Agreement (the "Agreement"), a contract between Developers and the City, incorporated the approved conditions of the PUD.

117.    The Agreement states in Section 4.23(a) that a condition of the PUD is that "Developer will use its reasonable efforts to mitigate any material adverse impact of the

21

development on the City and any areas that are adjacent to the Project as the development progresses through the various phases."

118.    The dangerous dust plumes Defendants continually cause to blow into the neighborhoods surrounding the Demolition site significantly interfere with the public's health, safety, peace, comfort, or convenience.

119.    Michigan Administrative Code, Rule 336.1901 ("Rule 901") provides that, notwithstanding the provisions of any other rule, a person shall not cause or permit the emission of an air contaminant or water vapor in quantities that cause, alone or in reaction with other air contaminants, either of the following: (a) injurious effects to human health or safety, animal life, plant life of significant economic value, or property; or (b) unreasonable interference with the comfortable enjoyment of life and property.

120.    Part 55 of NREPA defines "air contaminant" to mean a dust, fume, gas, mist, odor, smoke, vapor, or any combination thereof." MCL 324.5501(a).

121.    Defendants' fugitive dust plume emissions are an air contaminant in violation of Rule 901.

122.    Defendants' fugitive dust emissions are proscribed by law, as they violate each of the laws set forth above.

123.    Defendants' fugitive dust emissions violate the PUD, and therefore are a nuisance per se.

124.    Defendants know or should know that their actions are producing and will continue to produce a permanent or long-lasting, significant effect on the health and property rights of local residents.

125.   Defendants' fugitive dust plumes annoy, injure, and endanger the safety, health, comfort or repose of the public, and renders the public insecure in life or property.

126.   Therefore, the fugitive dust plumes constitute a public nuisance under the law.

127.   Additionally, Defendants' oil spill into the Rouge River violated Part 31 of the NREPA.

128.   Defendants' oil spill unreasonably interferes with common rights of the public.

129.   Defendants' failure to use its reasonable efforts to mitigate the material adverse impacts of its dust plumes violates a condition of its PUD.

130.   By violating its PUD conditions, Defendants violate the Northville Zoning Ordinance.

131.   Defendants' lack of adherence to health and safety standards, causing an oil spill and constant fugitive dust emissions into nearby neighborhoods, constitutes a public nuisance and nuisance per se in violation of the law.

**COUNT III: NEGLIGENCE (As to the Developer Defendants)**

132.   Plaintiffs reallege and reincorporate by reference the preceding and subsequent allegations.

133.   Here, Defendants owed Plaintiffs a legal duty to conduct their demolition activities with reasonable care, such that third-party bystanders and/or those in close proximity are not harmed by Defendants' activities.

134.   Defendants owe a duty not to allow materials from their property enter onto Plaintiffs' properties.

135.   Defendants breached those by allowing dust to get on Plaintiffs' properties.

136.    Michigan Administrative Code, Rule 336.1901 ("Rule 901") provides that, notwithstanding the provisions of any other rule, a person shall not cause or permit the emission of an air contaminant or water vapor in quantities that cause, alone or in reaction with other air contaminants, either of the following: (a) injurious effects to human health or safety, animal life, plant life of significant economic value, or property; or (b) unreasonable interference with the comfortable enjoyment of life and property.

137.    Part 55 of NREPA defines "air contaminant" to mean a dust, fume, gas, mist, odor, smoke, vapor, or any combination thereof." MCL 324.5501(a).

138.    Defendants' fugitive dust emissions are an air contaminant in violation of Rule 901.

139.    Defendants' violation of Rule 901 is prima facie evidence of their breach of a duty owed to Plaintiffs.

140.    Plaintiffs are injured by the accumulation of dust because, among other things, it reduces their properties' values and prevents the normal use of their properties.  Plaintiffs also have to clean the dust and, eventually, will have to abate the dust from their properties.

141.    In addition, depending on the kinds of chemicals likely to be found in the dust, the land and the structures thereon are likely contaminated, perhaps indefinitely, as chemicals such as asbestos, PFAS, PCBs, lead, mercury, and other heavy metals, are not easily removed from the ground or surfaces on which they accumulate.

142.    Defendants' actions are the proximate cause of the dust accumulation on Plaintiffs' land and homes because it is reasonably foreseeable that the demolition activities occurring with regularity at the Site across from Plaintiffs' neighborhoods could cause such dust to form and

accumulate on such nearby properties.  It is further foreseeable that dust could accumulate on Plaintiffs' properties without proper dust control measures.

143.    Therefore, Defendants' actions constitute negligence in violation of Michigan law.

**COUNT V: VIOLATION OF MEPA (As to Developer Defendants)**

144.    Plaintiffs reallege and reincorporate by reference the preceding and subsequent allegations.

145.    Part 17 of NREPA, the Michigan Environmental Protection Act (MEPA), MCL 324.1701-1706, authorizes courts to enjoin conduct that harms, pollutes, impairs, or destroys the environment.

146.    MEPA empowers citizens to bring suit "for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." MCL 324.1701(1).

147.    The word "impairment" as used in MEPA means to "affect in an injurious manner."

148.    Defendants' oil spill has polluted, impaired, and destroyed the Rouge River, and therefore in violation of MEPA.

149.    Defendants' fugitive dust pollutes and impairs air, and thus also violates MEPA.

150.    Furthermore, violation of environmental rules can provide a presumption of impairment and establishes a prima facie case under MEPA.

151.    Defendants' oil spill violated Part 31.

152.    Additionally, as explained above, Defendants' demolition activities giving rise to fugitive dust emissions that qualify as an air contaminant under Part 55 and/or Rule 901.

153.     The air contaminants caused by demolition activities at the Site have a high likelihood to cause injurious effects to human health and safety, animal life, and property, due to the likelihood of hazardous and toxic substances being present within the dust.

### COUNT VI: DECLARATORY JUDGMENT (As to All Defendants)

154.     Plaintiffs reallege and reincorporate by reference the preceding and subsequent allegations.

155.     Defendants' demolition activities at the site create a private and public nuisance, trespass on Plaintiffs' properties, are negligent, and violate MEPA, for the reasons stated above.

156.     Defendants' actions therefore violate Michigan law.

157.     There is an actual case or controversy between the parties regarding whether Defendants are releasing and will continue to release dust plumes that impact the health of the local residents, their property, and the environment, and whether Defendants are meeting their obligations to prevent, mitigate, and abate such releases.

158.     A present adjudication of this controversy is necessary to guide the parties' future conduct and preserve the parties' legal rights.

159.     This Court has authority to declare the Defendants' actions invalid pursuant to MCR 2.605 and other applicable law.

### COUNT VII: WRIT OF MANDAMUS (As To City of Northville)

160.     Plaintiffs reallege and incorporate by reference the preceding allegations.

161.     Under the Michigan Zoning Enabling Act, the City is required to enforce its zoning ordinance.  MCL 125.3407.

162.     The Developers violated the Zoning Ordinance by creating a public nuisance. Northville Zoning Ordinance Section 33.02.

163.    By not enforcing its Zoning Ordinance, the City has not complied with its clear legal duty to do so.

164.    Under Section 86-51 of the Northville Code of Ordinances, "no free service shall be furnished by the water system to any person, public or private."

165.    The City has a clear legal duty not to allow free service to the Developers.

166.    By allowing the Developers to use water without connecting to a meter, the City has failed to fulfill its legal duty.

167.    Under Section 34-119 of the Northville Code of Ordinances, a grading permit shall not be issued for grading involving the movement of more than 1,000 cubic yards of soil unless the permittee shall first post with the building official a bond executed by the owner and a corporate surety with authority to do business in this state as a surety.

168.    The City had a clear legal duty not to grant a permit before obtaining a bond from the Developers.

169.    By granting a permit to Developers in advance of securing a bond, the City has failed to fulfill its clear legal duties.

170.    Under Section 34-126 of the Northville Code of Ordinances, "the requirements of this article shall be enforced by the building official."  The City therefore has a clear legal duty to enforce the requirements of that article.

171.    Developers have violated several sections of the Soil Erosion and Sedimentation article of the Northville Code by: failing to maintain soil erosion protective devices (Section 34-123); failure to prevent damage to public utilities or services (Section 34-118(1)); Failure to prevent damage to adjacent property (Section 34-118(2)); failure to carry out proposed work in

accordance with approved plans and in compliance with permits (Section 34-118(3)); and failure to promptly remove soil and other material deposited on public streets (Section 34-118(4)).

172.     By failing to require the building official to enforce these violations with respect to the Developer's Soil Erosion and Sedimentation permit, the City has failed to fulfill its legal duties under the law.

173.     Under Section 14-153 of the Northville Code of Ordinances, "Whenever an enforcement officer of the city determines that there exists a violation of this article, or has reasonable grounds to believe that such violation exists, he shall send notice to the person responsible for the property." Such notice includes a description of the violations and a correction order.  Northville Code of Ordinances Section 14-153(1).

174.     The City has a clear legal to duty to send a violation notice per the above requirements.

175.     Moreover, under Section 14-255 of the Northville Code, the building official is "directed to make inspections to determine the condition of…premises located in order that the safeguarding of health and safety of the occupants of dwellings and of the general public may be performed." Section 14-155(1) requires "all premises" to "be maintained in a clean, safe and sanitary condition free from any accumulation of rubbish or garbage, except in accordance with city regulations."  "Premises" is defined as "any lot or parcel of land inclusive of the buildings." Northville Code of Ordinances Section 14-152.  "Rubbish" is defined to include dust.  Northville Code of Ordinances Section 14-252.

176.     By allowing the Developers to accumulate dust on The Downs and failing to enforce its regulations, the City has failed to fulfill its duties under Section 14-153 and Section 14-255 of the Northville Code.

177.     The legal duties of the City as set forth above are purely ministerial.

178.     Notably, Plaintiffs are not contending *how* the City must exercise any discretion in fulfilling its clear legal duties as set forth above; Plaintiffs are merely seeking an order that the City fulfill their legal duties.

179.     Plaintiffs have no adequate legal or equitable remedy to require the City to enforce its Code and Zoning Ordinance against the Developers.

180.     There is an actual case or controversy between the parties regarding the necessity of enforcing the applicable local ordinances to prevent injurious fugitive dust emissions and require oversight of operations by the City.

181.     A present adjudication of this controversy is necessary to guide the parties' future conduct and preserve the parties' legal rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, granting the following relief:

A.     Award Plaintiffs all compensatory damages available under the law, including for diminished property value, interference with the use and enjoyment of Plaintiffs' properties (including the mental annoyance and fear of future injury), and cost to abate the dust on Plaintiffs' properties.

B.     Enjoin Defendants' nuisances and order all nuisances to be abated.

C.     Enjoin Defendants' development activities at the Downs Development until all laws are complied with and proper dust abatement measures are in place to prevent any future nuisance.

D.      Enter an appropriate order preventing pollution, impairment, or destruction of the natural resources, and ordering abatement of any such impact to the natural resources that has already occurred (such as the oil spill).

E.      Enter a temporary restraining order and preliminary injunction enjoining Defendants' development activities at the Downs Development.

F.      Award Plaintiffs costs and attorneys' fees, with interest, incurred in bringing this action; and

G.      Grant such other and further relief as the Court deems just, including any relief allowed by applicable statute, court rule or common law.

## VERIFICATION

I, Jeffrey Snyder, verify the foregoing Verified Complaint.  I declare under the penalties of perjury that his Verified Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief, including based on my reasonable investigation.  For those matters stated upon information and belief, I believe them to be true after reasonable inquiry.

Executed on July 16, 2024.                             _____*/s/ Jeffrey Snyder*_____
                                                       Jeffrey Snyder

                                                       Respectfully submitted,

                                                       **VARNUM LLP**
                                                       Attorneys for Plaintiffs

Dated: July 16, 2024                         By: __*/s/ Kyle P. Konwinski*_____
                                                   Kyle P. Konwinski (P76257)
                                                   Christopher J. Biggs (P86704)
                                                   Bridgewater Place, P.O. Box 352
                                                   Grand Rapids, MI 49501-0352
                                                   (616) 336-6000
                                                   kpkonwinski@varnumlaw.com
                                                   cjbiggs@varnumlaw.com

25849115.1